Good morning, Your Honors. May it please the Court, my name is Steve Hale. I'm here for thoughts. The District Court first construed the Q2 complaint in its order on the duty to defend early in the case, and after reconsideration held very plainly that the G2 complaint did, in fact, state a claim for disparagement under the Lanham Act, Prong 2. The case then went quiet for a period of time because the court wasn't going to do that. Wasn't that for purposes of duty to defend? It was, Your Honor. But that's different than indemnity, right? Not on this point, Your Honor. Why not? Well, we can see, in fact, I've argued many times that the duty to defend is broader than it is indemnified. But in both cases, you still must have a complaint that alleges a claim. On the duty to defend, you presume the inferences for the policyholders. If there's any chance of proof of the claim, then they get the defense. That's what Judge Rothstein ruled. That's correct. When it gets time to look at the indemnity, you have to prove indemnity. But in this case, in the case of Luria and Nordstrom, you have to presume that the settlement expunged that risk and that element of the claim is not retried. So in looking at indemnity, the court still must construe the complaint. Does it, in fact, allege a claim? Yes. Well, Mr. Hill, you know, you've given us an awful lot of what back and forth in the case of Luria and Nordstrom. But as I read the Gillette complaint, maybe I'm wrong, but it seems to me the Gillette complaint alleges ads that were run in 97 and 98. Is that true? I'm sorry, Your Honor. I didn't understand. The Gillette complaint alleges ads that were run in 1997 and 1998. Is that true? Yes, Your Honor. So that's what the settlement covered. Is that correct? No, Your Honor. It covers more ads because the Gillette complaint says, among others, in all instances. So the only ones listed are 1997 and 1998. I believe that's correct, Your Honor. All right. So that's what the settlement covered. We look at the allegations. But the evidence – Isn't that what the Nordstrom case tells us? We look at the allegations? Right. In the allegations, Your Honor, it says, and among others. Can you tell me where this is in the record? Yes, sir. The complaint – I can't give you the ER pages, but I can tell you the paragraphs of the complaint. I can read them to you. It's the ER – What about 43? I now see that. I do have 43 and 44. Paragraph 6 says, Octavian makes its sonic and beyond-the-bristles claim in the following ways, comma, among others. And it lists those specific examples and attaches them. What page are we on? ER 43, Your Honor. 43. I've got ER 42, and it skips to ER 45. Oh, my gosh. Catch 22 always gets you. 43 and 44 are in the complaint. You provided us with this, didn't you? Absolutely, Your Honor. And I got my copy from our copy of the record just, you know, yesterday as I put my book together. All right. Now – all right. That one, 43. Octavian makes its sonic and beyond-the-bristles claims in the following ways – Titanic ad, possibly among others. No. There's no word possibly. It says among others. No. It says possibly right here. 6A, possibly among others. 6A. Look at 3. 6A. Of course it's possibly it. Well, that's because they are saying we're not sure where all you read the Titanic ad. Possibly. But, Your Honor, I think the point on 6 is the Titanic ad is among other ads. 6A – No, it doesn't. You can read it that way, or you could read it that Optiva makes its claim in the following ways among others, and it's talking with respect to this ad and then specifics, but there could be other specifics with respect to this ad. It's very – I suppose you can read it that way, Your Honor, but all the inferences, of course, go to us on the summary judgment issue. But the record is absolutely clear that as this case developed, Gillette came forward with 340 separate ads. No, but we're told from large firms, we look at the allegations. Yes. And the allegations say 97 and 98. The allegations I just have to differ with, Your Honor, because I read it as saying – Well, where does it say any other date? 6 doesn't purport to limit the complaint to 97, 98. They say these kinds of ads have been made by Optiva in the marketplace in these ads among others. That's a fantastic argument. When a point is so clear in giving dates and specifications, you say somewhere back there, there might be other things. But there aren't any other things. Well, there are, Your Honor, because they spent several years, and Optiva spent $7 million defending the claim, and they bought about 340 ads. Yeah, but weren't they sued already for the other ads? There was a G1 case that had some of these ads in them. Close to trial of G1 in the Southern District of New York, Gillette asked to amend. The trial judge says it's too late, and so Gillette filed G2. It got put on hold until G1 got tried. When that case was completed, G2 got going. Our coverage case was put on hold until G2 was concluded. It concluded by settlement. At the time, there were 340 ads being argued about. Magistrate Freeman had addressed the scope of discovery, not the scope of the complaint, had said that discovery should be limited until the complaint is amended. Gillette was going to amend the complaint. The parties got serious and settled the claim. It wasn't amended. It was not. So there's no amendment going into what possibly might have been in other things. So we look at the allegations. Nordstrom was very clear precedent for that. I believe that's the case, Your Honor. But I would argue, in interpreting Nordstrom, that even if we take the view that Your Honor is announcing here, that when you settle a case, you settle the claims that are alleged in the complaint. No question about that. But when you look to see what is in those claims, you can look at the other parts of the record. It is completely incongruous with reality to say that we didn't settle all the claims. There were 340 ads, excuse my voice this morning, at issue. It was a very vigorously disputed case, as these big manufacturer Atlantic cases are. Did the settlement agreement identify the ads that were in it? All ads, Your Honor. Every ad, every claim, major could have been made up to that point. Very inclusive. And I think, Your Honor, for the purposes of determining what we settled, we can't read out of this case among others. Because the reality of the case is there were many others. And I'm sure the trial bench wouldn't want to see a complaint that attached 340 ads. That's not the kind of pleading rules we have. They were very careful to include some ads, as an illustration, and they attached some of those ads at the complaint. So there's no question about what the complaint is. Do you have some law that says we look at the actual settlement agreement? I think, indirectly, Your Honor, I think even Nordstrom and Luria say this because they say what was settled. And the settlement agreement describes what was settled. Now, I would agree if we actually settled, for example, a patent infringement claim along with this and we weren't sued for that, I think there's a much stronger argument that you can't say that that was part of what you settled for the purposes of coverage. Is the district court just wrong when she says that Phillips' actual liability to Gillette was frozen at the time of settlement by what was then in the complaint? If you say, let's put a few more modifiers in that sentence, Your Honor, say Phillips' potential liability under the G-2 complaint as pled, unamended, was as it was at the time of settlement, I would agree with that. But they hadn't amended it. Your Honor, think if the court adopts that in an affirmative district court's ruling, then what you're going to have to say to all the litigants is, look, I've got this insurance out here. If I don't settle this case, there's going to be an amendment and there'll be a trial and we can spend another $7 million, which was the projection for the additional defense cost through trial, and I'll get my insurance. Or you force the litigants to say, I might settle with you, but you're going to have to amend your complaint first to put these other claims in, which you might not. What's wrong with that? Pardon me? It's contrived. What's wrong with that? I think it's contrived, Your Honor. Well, then, I mean, you're trying to settle the case. You say, I can settle it with you if you amend your complaint. It's rather easy. But what's the problem with that? I think that introduces into the settlement process factors in some cases that could inhibit the conclusion of settlement. Why? Because you're driving toward a conclusion to settle these particular things. You need the insurance. You know the law of the circuit. The state doesn't know what it's from. We're not adopting a new rule. We're following a precedent. And I understand that, Your Honor. You need a precedent when you settle the case. But let me just say this, if I may, please. Assuming that you decide that I lose everything that we've been talking about so far, which would disappoint me, but, you know, those things happen. We do, in fact, have other ads that are in the settlement. Those ads are clearly identified in the complaint, specifically, and attached. Those are among the things we settled. So, with all due respect to the district court, we failed to see how the court can conclude that Octiva, and it was then Phillips that acquired them, didn't settle the prompt sublimate claims expressed in 1921, 22, and 17, supported by the factual allegations of 167, and the attached ads of the Titanic ad. I mean, without any question, from my humble perspective, this is a classic, quintessential, pronged-to-Lanham Act claim in paragraphs 17, 19, 21, and 22. And there are specific allegations in 167 of specific ads using exclusively incomparable language, which state, again, from my perspective, beyond a reasonable doubt, a classic, quintessential disparagement claim. We settled those, even if the other ads aren't in. But returning for a moment to the prior questions, what if this complaint didn't have paragraphs 6 and 7? The complaint simply said, you have engaged Octiva in unfair advertising. That advertising has disparaged our Braun Oral-B product. It has diminished that product in the eyes of the consumers, as this complaint says. And there was no ad specified. How would the Court ever then decide what you settled? You would decide it by going to the actual case. I mean, I'm not conscribing what was settled. That's a wonderful hypothetical, but we don't have it. No, but we have it all the time, because the pleading rules throughout the nation, Federal court, State court, says, don't give me a 75-page complaint. This is notice pleading. Notice pleading. You read the complaint very little. I'm sorry. Notice pleading, you're correct. Yes. And you look at the allegations very generously. Yes. And then we settled. I mean, this is not like a contrived settlement. This was a very hard-fought case. And they sat down and they did business, finally. After years and years and millions of dollars, they did what Washington law wants them to do, settled the case. And then there's Catch-22 because we want to read out, among others. They were there in spades. And, in fact, the record was for the district court because that was all submitted. Before you sit down. Yes, sir. I want to ask you one question about the change in the text of the policy. Yes. These – there was an ongoing relationship here.   Yes. In fact, Federal was the first insurer. Vaughn Tate was a new company. They had a policy – there were two policies, three years each, six years. And for the first three years of their relationship, the policy included the language of disparagement. Yes, Your Honor. In the fourth year, the policy language changes. Yes, Your Honor. That issue was briefed to the court. Do you think that Admiral – or Federal, I guess, is here – was – you know, there was a change – I mean, a significant change was contemplated by that? I can't say what was in their minds, Your Honor. We didn't have that discovery. But I can say that this whole issue of which – what that difference means, if anything, under Washington Law was briefed to the court early on. The court held all policies cover disparagement, applying the Kitsap County – This is de novo now, so – Pardon me? This is a de novo review. But that issue wasn't appealed, Your Honor. We didn't brief it. It wasn't – they filed no cross-appeal. The issue on appeal is whether the – whether the complaint states a claim for disparagement and whether we settled that claim. I believe it's that narrow. I mean, we're happy to brief the other one. We won it once. I think we can win it again. It's just not today. All right. Before you sit down, I should tell you – Do I still feel like I'm running? I wanted to tell you that I had taken out 43 and 44. It came back to me. Those were the key pages. That's why I – Nobody on your staff failed to put them in. Right. I just removed them and – Thank you. I'm escaping my rescue. I'd like to reserve some time, please. You may. Thank you. Good morning, Your Honors. My name is Chris Neal, and I represent Federal Insurance Company, AFL-E in this matter. Preliminarily, I'd like to correct two points made by Phillips Counsel. One is with regard to the scope of the settlement agreement. If you turn to ER-303 regarding scope, the particular part I want to draw your attention to is that all the claims that were raised in the G-2 complaint were settled. There are no reference that I can see that claims – that makes any reference to the ads. And I wanted to make that clear. The second point I wanted to make concerning what Mr. Hales said had to do with the judge's order on the duty to defend, where she discussed the change that Judge Baez mentioned in the two policy – two policies, the earlier policies and the late policies. In the duty to defend, yes, she did hold that liable could be interpreted for the purpose of duty to defend. But in her order on summary judgment, which is before this Court, she clarified her situation with respect to indemnity and concluded that there would be coverage under the earlier policies, potentially for ads containing claims that were disparaging that were run in the 93 to 96 period, but not afterwards. Before I begin, I wonder if the panel has any questions for me based on what Mr. Hales has told you. Don't you read this complaint liberally? Do I personally? No. Okay. Under the rules. I think – I think that that is – that's probably Washington law, Your Honor, yes. So if you read it generously, why doesn't that inert to their benefit? Because I don't see any disparagement in there. I don't see – Well. Under their definition of disparagement to belittle, to downgrade, to slight, I don't see where Phillips ads are alleged by Gillette to have belittled, slighted, or downgraded the Gillette product. I don't see the factual support for that and neither does Judge Rothstein. Well, this one little ad that they attach, you know, this Titanic, the Titanic, and if you go to the second page, then this ad is attached to the complaint, at least to my version of the complaint. I don't know how many ads are attached to the complaint. I think six or seven. I think you're talking about ER-53, Your Honor. Yes. And I'm specifically talking about ER-54. Okay. And they have this little chart that says gum disease causing germs below the gum line decreased over 60% by using Sonicare but increased over 60% by using Grom Oral B. Oh, my God. That sounds like that sounds like disparagement to me, Judge. Isn't that disparagement? And it sure did. And it sure sounded like disparagement to Gillette when they filed that claim in Gillette 1, an entirely different suit. That claim is what was at issue and that's why we had a duty to indemnify Gillette 1. They brought to the Court's attention in Gillette 1 that Phillips had run these ads saying if you use the Gillette product, you're going to get gum disease. And that certainly is product disparagement. And, in fact, so much so that there was a jury verdict against Phillips on that very point and they had to pay a significant amount of money. They came to Federal for indemnity and sure enough because there was product disparagement as a result of this ad and possibly a couple of others, we indemnified them. The difference in Gillette 1, Gillette 1 was the main event, if you will, and then as they pursued through that litigation, they concluded, they being Gillette, that we didn't get everything in that we wanted to get in. We need to amend. Well, it was too late in the litigation and the Federal judge there didn't let them amend. They filed a separate lawsuit for the remaining claims on the same ads that they had failed to identify or include in their original complaint in G1. Couldn't you say that these ads, didn't these ads run in the 78 period or 98 period, whatever, what are we talking about? I believe these ads all ran in the 98 period, but at this point I'm not prepared to say that expressly to the Court because there are, you know, potentially at one time there were 341 ads with several iterations. So I think with respect to the ads that are attached, you're right. So couldn't you have a continuing product disparagement claim that began, you know, a new, not a continuing but a new one that begins in 98 that was not covered in the earlier litigation? I think potentially you could if you had a policy that would provide coverage. That gets her back to how you then interpret the policy. Exactly. Or it gets back to your Admiral case saying we can talk about prior publication. Well, your co-counsel there or your opposing counsel there said that you didn't challenge the district court's interpretation. No. Her interpretation if you're talking about the difference between   and total agreement with it with respect to her duty to indemnify which is the issue before this panel. And I think that's a good argument to make that I didn't have a problem with it on the duty to defend. I think you do have to be ultra expansive when you look at the duty to defend but when you are talking about the duty to indemnify you're talking about indemnifying the insurer for the claims that actually settled. And things began to narrow down a bit at that point. So I'm in complete agreement with her order and I saw no need for a cross appeal. I think she did a good job. So I mean in your well how do you interpret does slander or libel include product disparagement? I think there are various forms of defamation. There are defamation against the person and you've got slander and libel. That's not at issue here. If you go through their briefing they being Phillips you don't find anything. I think libel has gone by the board. You get into other kinds of defamation including disparagement or defamation of another's product. Isn't it libel to say that that Phillips made false misleading statements? Not if there's no factual support, Your Honor. What if Phillips had said that Gillette's toothbrush was blue? What you have is a false misrepresentation about the Gillette product but you don't have a disparagement of that product. It's not disparaging to say something. The policy covered libel and slander, didn't it? Both sets of policies cover libel and slander of Gillette. Can't some of these allegations be read to be libelous or slanderous of alleging that  made libelous and slanderous comments. And I think I understand what you're saying, Your Honor. Judge Rothstein addressed that very issue when she addressed the coverage on Gillette 1. You can have a degree of product disparagement that is so severe that it begins to impugn the character and quality of the manufacturer of the product. The Wachter case from eastern Washington comes to  as a   a disparagement of the manufacturer. Well, that implied that there was a health and safety question with respect to that milk manufacturer and that's trade disparagement that rose to the level of libel. And that's     manufacturer of the product. I don't know why not, though. Because they How could the G1 complaint resolve all publication of the ads that occurred subsequent? Because they there's been a complaint with respect to the manufacturer of the product. And they are entitled to more damages. They didn't compensate it up until the time of the jury verdict, but you ran them again. And now you've got false misrepresentations about Phillips' own product. There's no mention of Gillette's product. There is no disparagement of Gillette's product in the complaint. And these ads that you're talking about were addressed in G1, a completely different way. And I  that the insurance company is going to take the position that I'm only going to indemnify for what you settled. I want to see the complete picture of what you settled. Any I'd like to see what went on in discovery as well. I'd like to get a full picture of what went on in the litigation. Because we're only going to indemnify for the claims that they settled that fall within the coverage of our law. And I'm  to go into the details of that. But I would like to get a full picture of what went on in the litigation. And I would like to
judges: Noonan, Wardlaw, Paez